### In re the MARRIAGE OF George W. HASH and Mavis C. Hash.

### George W. HASH, Petitioner–Respondent,

### v.

### Mavis C. HASH, Respondent–Appellant.

#### No. 17738.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 27, 1992.

Rehearing Denied Sept. 18, 1992.

John Alpers, Jr., Cabool, for petitioner-respondent.

Richard L. Schnake, Neale, Newman, Bradshaw and Freeman, Springfield, Philip S. Huffman, Hartville, for respondent-appellant.

MAUS, Judge.

In dissolving the 21–year marriage of George W. Hash (Husband) and Mavis C. Hash (Wife), the trial court set apart to Husband, as his separate property, certain tangible and intangible property without assigning a value to that property. It set apart to Wife real and tangible personal property without assigning a value to that

property. It also set apart to her, as her separate property, an annuity the court valued at $111,000.00. The trial court awarded marital property to Husband valued at $162,646.65 (70%). It awarded Wife marital property valued at $69,979.85 (30%). Wife's point on appeal is that this distribution of marital property, so heavily weighted in favor of Husband, constitutes an abuse of discretion.

The parties, who lived in California, were married May 30, 1969. Husband was 43 years of age. The Wife was 46 years of age. Each had been previously twice married. Husband had no children. Wife had two daughters by her first marriage. Wife acquired an appreciable amount of intangible assets by reason of the death of her second husband.

Husband had worked as a shop foreman for an equipment company. At the time of the marriage, he was disabled by reason of a back injury. He received disability benefits for approximately five years. At that time, it was determined he was no longer disabled. He elected to accept early retirement. He receives retirement benefits of $449.00 per month. He also receives social security benefits of $577.00 a month.

At the time of the marriage, Wife was a clerical employee for McDonnell Douglas. She continued that employment until August 8, 1972, when she went on sick leave. She terminated her employment on January 18, 1973, after having worked for McDonnell Douglas for 22 years. While she continued working during the marriage, she contributed her salary to the marriage. She receives a retirement benefit of $140.52 per month. She also receives social security benefits of $391.00 per month.

At the time of the marriage, Husband owned a house. He sold that house for $21,900.00. After paying the mortgage, he received payment in the form of cash and a 40–foot boat. The trial court found the net proceeds were $17,900.00. Husband also owned another 40–foot boat, a 1957 Chevrolet truck equipped for excavating, a 1957 Cadillac and his personal effects. He was buying 10 acres of land in Oregon. At the time of the marriage, Wife owned her personal effects, a full complement of household goods and furnishings and a new 1969 Chevrolet Impala. She had two lots in Salton Sea, California. She also owned certain intangible assets which were eventually transferred into the annuity, which will be hereafter described. Wife testified she intended for these funds, and later the annuity, to be set apart for her daughters.

After the marriage, the parties bought a house for $39,900.00. Husband testified he paid the down payment of one-third. Wife testified that she advanced $2,500.00 and the parties borrowed an additional $2,500.00 to make the down payment. Husband remained on disability. Until 1970, he worked, apparently only part-time, at a marina repairing boats. As noted, Wife continued her employment with McDonnell Douglas.

Starting in 1970, the parties made a series of profitable investments. They first bought a scrap metal business for $8,000.00. They paid $2,000.00 down and the balance of the purchase price was paid from earnings and profits. In 1972, they bought an adjoining salvage business for $8,000.00. They leased the land upon which the businesses were located. The lease gave them an option to purchase that land. In 1978, they sold the scrap metal business and the salvage business for $150,000.00. Shortly thereafter, they sold the option to purchase the land for $100,000.00.

Husband worked in the two businesses. While she continued working at McDonnell Douglas, Wife worked part-time in the businesses, keeping the books. When she quit McDonnell Douglas in 1973, Wife did most of the clerical work for the businesses. They operated a firearms business in connection with the scrap metal business. The firearms business required a large amount of paperwork.

In 1977, the parties purchased a four-acre recreational vehicle park near Chiloquin, Oregon, approximately 25 miles north of Klamath Falls. The Water Wheel R–V

Park was located on a river and it had a boat dock, R–V hookups, and a double-wide mobile home for living quarters. The purchase price was $60,000.00. In June 1978, the parties moved to the R–V park and assumed its operation. For a short period of time, Husband worked at a nearby service station and Wife ran the park. Later, after business improved, they both worked in the business, which during the summer months demanded virtually 24–hours per day attention. In June 1981, they sold Water Wheel R–V Park to Harrelson for $150,000.00. Harrelson paid $20,000.00 down. He defaulted in his next payment and the parties repossessed the park in 1983. They resold the park to the Sweezys for $150,000.00. The Sweezys paid $20,-000.00 down and assigned to the parties a real estate contract said to be worth $12,-000.00. The Sweezys executed a note for the balance of the purchase price.

Husband sold the two 40–foot boats in 1975 and purchased a 55–foot twin diesel yacht. In June 1978, he sold the yacht for approximately $45,000.00. The yacht was mortgaged for approximately $20,000.00. The sale netted the parties about $25,-000.00. Wife wanted to segregate her half of the profit and obtained a cashier's check for her half. Wife deposited the money in a joint account that required two signatures for withdrawal. The money remained in that account until the parties moved to Oregon, when they used part of it to purchase 10 acres of real estate and part to purchase a 1979 Oldsmobile Cutlass for Wife.

The 10–acre tract, which was improved with a mobile home, barn, and corral, was about one and one-half miles from Water Wheel R–V Park. The parties paid $35,-000.00 for the property. They added another mobile home, at a cost of $3,000.00, for a rental unit. They also kept wild horses and pigs there. They later sold the property for $52,000.00 at an overall profit of $8,800.00. The money from the sale was deposited in the Bank of Houston, Missouri.

In 1981, the parties moved to Missouri. They bought 120 acres of unimproved land near Elk Creek for $41,000.00. They improved it by a double-wide mobile home which cost $39,000.00. They also built a barn, a shop and a pump house for the well they had drilled. Husband started clearing the land and farming. At the time of trial, 70 acres of the farm were in grass and another 20 acres had been cleared but were not tillable. At one time, Husband raised hogs. He started raising hereford cattle, but changed to black angus. At one time, he had 22 sows, 2 boars and 46 head of black angus, including one bull.

In addition to farming since June 1984, Husband has worked as a real estate agent. Since 1987, his income as a real estate agent has averaged $674.40 per month. Husband testified he had to hold down his hours so his real estate agent income would not adversely affect his social security. He testified he wanted to quit the real estate business and devote his time to farming. He testified that he had a back injury, his blood pressure was high and his right knee bothered him.

Throughout the marriage, Wife had been the "homemaker". After the parties moved to Missouri, Wife did not work outside the home. She traveled frequently. She testified she has bad knees, a bad leg, arthritis and high blood pressure. At the time of trial, she was 67 years of age and stated that she did not think she was able to hold down a full-time job.

Wife testified that in August 1988, during an argument over a bank account, Husband abused her. She testified,

"he gets mad at me and then he starts with his fist raised or after me and ... that night he got me right by the bar and took his [fist] like this and he rammed it into my chest and he walked up to me— and he doesn't hit with his hand—I mean with his fists. He uses his hands kind of and he stomped with his boots on my

instep—his heel on my instep of my foot. And I grabbed a wrought iron chair that was sitting there and I put it up in front of me. And he stood there and grabbed the chair and he said, ' "I'll stuff this chair down your goddamn throat." ' And I said, 'That's the last time you'll touch me.' And I headed for the door. He tried to stop me."

Wife went to a neighbor's house to use the neighbor's telephone to call the sheriff's department. The neighbor testified that she saw the Wife's foot and it was swollen. The next day, Wife filed an adult abuse action. On August 21, 1988, upon agreement of the parties, the court entered a full order of protection. Husband denied the abuse took place.

The trial court made findings of fact and conclusions of law. Those findings included the fact that Husband contributed all of his separate property, except the 10 acres in Oregon, to the marital estate. The trial court made no finding concerning the disposition of the Wife's extensive household goods and furnishings or her 1969 Chevrolet Impala. The finding emphasized Wife's action in keeping her funds as separate property and the fact she did not inform Husband of the existence of those funds. The trial court also made extensive findings concerning the "John Alden Tax Deferred Annuity Contract # 4013438M". That annuity matures on May 27, 2023. There is a penalty for early withdrawal before 1995. Upon withdrawal, the proceeds of the annuity are subject to state and federal income tax. The only conclusion of law reached by the trial court was an extensive history of the source of the funds for the John Alden Annuity, why that annuity was separate property, the characteristics of that annuity and that the Wife owns "an indivisible contract right to receive specified annuity payments from John Alden, as her separate, nonmarital property".

The decree of the trial court results in the following allocation of the separate property of the parties.

## Nonmarital Property

| George | | Mavis | |
|---|---|---|---|
| Social Security benefits of $577.00 per month | | (Social Security benefits of $391.00 per month not mentioned in decree) | |
| Engineer's retirement benefits of $449.00 per month | | (Retirement benefits of of $140.52 per month not mentioned in decree) | |
| 10 acres of real estate in Oregon | $ UNKNOWN | Lots in Salton Sea, California | $ UNKNOWN |
| Personal effects and jewelry brought into marriage | $ UNKNOWN | Personal effects and jewelry brought into marriage | $ UNKNOWN |
| | | John Alden annuity $111,000. | |

The decree of the trial court divided the marital property as follows:

### Marital Property

| George | | Mavis | |
|---|---|---|---|
| 1977 Ford pickup | $ 1,750.00 | 1988 Oldsmobile Cutlass | $ 6,000.00 |
| One-half of Bank of Houston joint money market account | 23,479.85 (+/−) | One-half of Bank of Houston joint money market account | 23,479.85 (+/−) |
| 120–acre farm with mobile home and other improvements | . 80,000.00 | | |
| Farm machinery, equipment and tools | 12,500.00 | | |
| Guns and tack | 5,500.00 | | |
| Proceeds from cattle sale 1–12–1990 | 1,916.80 | | |
| One-half of Oregon notes receivable | 37,500.00 (+/−) | One-half of Oregon notes receivable | 37,500.00 (+/−) |
| | | Marital furniture and household goods | 3,000.00 |
| Cattle purchased during pendency of proceedings | UNKNOWN | | |
| Clothing and personal effects and household goods in his possession | UNKNOWN | Clothing and personal effects and household goods in her possession | UNKNOWN |
| TOTAL | $162,646.65 | | $69,979.85 |

As stated, Wife contends this unequal distribution of the marital property was an abuse of its discretion.

█ It is rote to observe the statutory mandate that the trial court "shall divide the marital property in such proportions as the court deems just after considering all relevant factors including [5 statutory factors]". § 452.330.1. It is trite to recognize the established interpretation of the statutory mandate.

"The statute requires a fair and equitable division of the marital property in light of the circumstances attending each individual case. It does not require an equal division of the property. *Lewis v. Lewis*, 637 S.W.2d 207, 209 (Mo.App. 1982); *Walker v. Walker, supra*, [631 S.W.2d 68 (Mo.App.1982)] at 71. A just division of the property cannot be accomplished by means of a mathematical formula or a rigid method. *Seiner v. Seiner*, 552 S.W.2d 54, 56 (Mo.App.1977); *Corder v. Corder*, 546 S.W.2d 798, 806 (Mo.App.1977). Consequently, the trial court is vested with considerable discretion in dividing marital property and an appellate court will interfere only if the division is so heavily and unduly weighted in favor of one party as to amount to an abuse of discretion. *Colabianchi v. Colabianchi, supra*, [646 S.W.2d 61 (Mo. banc 1983)] at 64; *Metts v. Metts*, 625 S.W.2d 896, 899 (Mo.App.1981)." *Dardick v. Dardick*, 670 S.W.2d 865, 869 (Mo. banc 1984).

However, it seems to be a generally accepted, but often unexpressed principle, the

division should be substantially equal unless one or more of the statutory and nonstatutory factors causes such a division to be unjust.

"In dividing marital property in Missouri, the trial court must follow the 'two major guiding principles inherent in the statute [§ 452.330]: first, property division should reflect the concept of marriage as a shared enterprise similar to a partnership; and, second, property division should be utilized as a means of providing future support for an economically dependent spouse.' *In re Marriage of Cornell*, 550 S.W.2d 823, 827 (Mo.App. 1977), quoting from Professor Krauskopf's article, *A Theory for 'Just' Division of Marital Property in Missouri*, 41 Mo.L.Rev. 165 (1976)." *Goller v. Goller*, 758 S.W.2d 505, 508 (Mo.App.1988). Also see *In re Marriage of Brethauer*, 566 S.W.2d 462 (Mo. banc 1978); *Doyle v. Doyle*, 577 S.W.2d 64 (Mo.App.1978). There is an extensive discussion and collection of cases in Annot., *Divorce—Property Division*, 56 A.L.R.4th 12 (1987).

In this case, aside from the annuity, the economic circumstances of the parties, the first statutory factor, seem to demand a greater share for Wife. Husband still farms and has substantial earnings as a real estate agent. Nevertheless, it must be recognized the parties are approaching the age and condition in life where their personal earnings will be limited. Even so, Husband has a monthly income of $577.00 social security benefits and $449.00 retirement benefits, a total of $1,026.00 per month. Wife has a monthly income of $391.00 per month social security benefits and $140.52 retirement benefits per month, for a total of $531.52. Husband was awarded a place to live and an income-producing farm. The Husband has the potential for greater income than that of the Wife. Cf. *Turley v. Turley*, 640 S.W.2d 473 (Mo.App.1982).

The trial court did not find any portion of the property listed as marital property to be separate property by reason of the "source of funds" rule. See *Hoffmann v. Hoffmann*, 676 S.W.2d 817 (Mo. banc 1984). Nor does Husband contend that any portion of that property was not in fact marital property. The trial court did not expressly base the unequal division of the marital property in favor of Husband upon the parties' contributions to the acquisition of the marital property, the second factor. However, the decree emphasizes the fact that Husband put all his assets, except 10 acres in Oregon, into the marital estate. This emphasis includes a finding of a contribution of $6,000.00 in cash, evidence of which is not found in the record. The decree gives no recognition to the contribution by the Wife of her household goods and furnishings and new 1969 Chevrolet Impala. In summary, the decree focuses upon Husband's contribution to the acquisition of the marital property, to the exclusion of the efforts and contribution of Wife.

It must be assumed Husband's initial financial contribution to the marital property was greater than the value of Wife's household goods and furnishings and automobile. That would have greater significance in the dissolution of a marriage of one-year's duration before the parties had, by their joint efforts over 19 years, accumulated the bulk of their marital property. *In re Marriage of Tune*, 716 S.W.2d 899 (Mo.App.1986). Wife did contribute her earnings from McDonnell Douglas, her work in the successful scrap and salvage business and her work in the operation of the R–V park. Husband acknowledged that during the marriage Wife was the "homemaker". Cf. *Goller v. Goller, supra.* The accumulation of the greater part of the marital assets resulted from work and contribution of both the parties. The significance of the greater initial financial contribution of the Husband has dimmed with the passage of time. *See* Golden, *Equitable Distribution of Property* (Family Law Series) § 8.20 (1983).

■ The third factor is "[t]he value of the nonmarital property set apart to each spouse." § 452.330.1(3). It has been recognized that, at least in part, the purpose of this factor is to permit recognition of the separate property as a means of providing future support for an economically dependent spouse. That recognition does not

demand the unequal division in favor of Husband. He was awarded the income-producing property of the farm, and he has a monthly income of $1,026.00, as compared to the monthly income of $531.52 of Wife.

The undue recognition accorded Wife's annuity is accentuated by the trial court's evaluation of that annuity. The trial court assigned the value of $111,000.00 to the annuity. It made no recognition of a discount for its present value or for the income taxes that will accrue when funds are withdrawn. While the Wife's separate property of the annuity must be considered, it does not demand or authorize a corresponding off-set against marital property.

"No case has been cited or found that holds such consideration should extend to a dollar for dollar consideration in the division of the marital property. Such a treatment to a great degree would eliminate the reason for the distinction between separate property and marital property." *Smith v. Smith*, 702 S.W.2d 505, 509 (Mo.App.1985).

The last applicable statutory factor is the conduct of the parties during marriage. Husband denied abuse of Wife. This court must recognize the trial court is the judge of the credibility of the witnesses. It was entitled to disregard the testimony of Wife and her neighbor concerning that abuse. Nevertheless, there is no evidence that the Wife was guilty of any conduct which would cause the fourth factor to preponderate in favor of Husband.

■ A non-statutory factor relevant to the division of the marital property is the oral stipulation of the parties expressed during the trial. This stipulation is asserted by Wife in her second point. This stipulation consisted of a number of specific agreements reflected in the decree of the trial court. Those agreements so reflected include an agreement the farm machinery, equipment and tools would be valued at $12,500.00 and the guns and tack would be valued at $5,500.00 and those items would be awarded to Husband. Also reflected in the decree is the agreement the furniture and household goods would be valued at $3,000.00 and be awarded to Wife. Not

reflected in the decree is the agreement that upon such awards the spouse not receiving the designated property "would be credited" with half of the value thereof. This agreement not expressly reflected or acknowledged in the decree would result in a net credit to Wife of $7,500.00.

■ In summary, this court concludes that the relevant factors established by the record do not justify a division of 70% of the marital property to Husband and 30% to Wife. In absence of such justification, such an unequal division is an abuse of discretion. Cf. *Turley v. Turley,* supra; *Smith v. Smith,* supra. In Suggestions filed with the trial court, Wife proposed that the marital property should be awarded substantially as the trial court did, except the whole of the note and real estate contract resulting from the sale of the R–V park should be awarded to her. In such Suggestions, Wife acknowledges that even such division would still be weighted in favor of Husband because the present value of the original obligations is substantially less than their face value.

It is the duty of this court to enter the decree the trial court should have entered. Rule 84.14. That portion of the amended decree awarding a one-half interest in Oregon notes receivable to Husband is reversed. That decree is amended to award Wife the whole of the obligations acquired by the parties as a result of the sale of Water Wheel R–V Park. This award includes the note executed by the purchasers for the unpaid balance of the purchase price and the real estate contract assigned to the parties in part payment of the purchase price. This award also includes all payments made upon those obligations since the date of trial, March 29, 1990. To the extent that such payments have been received by Husband, he shall pay the amount thereof to Wife. Wife is granted a lien upon the 120–acre farm to secure such payment. Husband shall execute such endorsements and assignments necessary to vest the title to the whole of those obligations in Wife. All instruments representing such obligations shall be delivered to Wife. The decree of the trial court is

further amended to distribute to Wife her retirement benefits with McDonnell Douglas and under Social Security. As modified herein, the amended decree of the trial court is affirmed.

FLANIGAN and MONTGOMERY, JJ., concur.