In re the Marriage of Betty Annette BETZ and Robert Francis Betz.

Betty Annette BETZ, Appellant,

v.

Robert Francis BETZ, Respondent.

No. 18706.

Missouri Court of Appeals,
Southern District,
Division Two.

July 22, 1994.

Ransom A. Ellis, Jr. and Robert C. Fields, Springfield, for appellant.

Phillip A. Glades and Joe Crosthwait, Joplin, for respondent.

CROW, Judge.

Betty Annette Betz ("Betty") appeals from a decree dissolving her marriage to Robert Francis Betz ("Robert"). Her sole complaint is that the trial court erred in dividing the marital property by awarding Robert too much and her too little.

■ The standard of appellate review in Rule 73.01(c), Missouri Rules of Civil Procedure (1994), as construed by *Murphy v. Carron,* 536 S.W.2d 30, 32[1] (Mo. banc 1976), applies to decrees of dissolution of marriage. *T.B.G. v. C.A.G.,* 772 S.W.2d 653, 654 (Mo. banc 1989). The decree will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Id.*

■ The Dissolution of Marriage Act consigns the division of marital property to the sound discretion of the trial court. *Dardick v. Dardick,* 670 S.W.2d 865, 868 (Mo. banc 1984). Appellate courts must defer to the trial court's decree unless it is deficient under the *Murphy* standard or an abuse of discretion is shown. *Dardick,* 670 S.W.2d at 868.

■ In our review, we are mindful that the trial court was free to believe or disbelieve all, part or none of the testimony of any witness. *T.B.G.,* 772 S.W.2d at 654[1]. Consequently, when determining the sufficiency of the evidence, we accept as true the evidence and inferences from it favorable to the decree, and disregard contrary evidence. *Id.,* at 654[2].

So viewed, the evidence established that Betty, age 44 at time of trial,[1] and Robert, age 53 at time of trial, married each other June 13, 1977. Each had previously been married to, and divorced from, someone else. Betty's first marriage produced one child; Robert's two.

Betty testified she was single seven years before she married Robert. He testified he was single two years before marrying her. Their union produced no offspring.

Betty testified she and Robert separated September 5, 1990, when she departed the marital bedroom (but not the residence).

Robert, a medical doctor, practices general surgery at a hospital in Neosho. He is a shareholder in the hospital, along with several other doctors. He practiced in Neosho seven years before marrying Betty.

Betty testified she has "approximately five years of college—liberal arts," but no degree. She worked for a certified public accountant four years immediately preceding her marriage to Robert. She remained so employed for the ensuing four years. She then terminated that employment because, as she explained, "[T]he personal problems I was having in my marriage were interfering with my job performance."

Betty remained unemployed for four years, then began working at a travel agency. She quit there in 1990, and was unemployed at time of trial.

Occupants of the marital residence at time of trial were: (a) Betty, (b) her mother, (c) Betty's child (a 21-year-old daughter), and (d) Robert.

The evidence showed, and the trial court found, that when the parties married, Robert had assets of $484,610 and debts of $174,707, for a net worth of $309,903. Betty had assets of $3,700.

The "marital residence," referred to earlier, was one of Robert's premarital assets. He and Betty signed a deed changing ownership to a tenancy by the entirety in 1983. Asked why, Robert testified: "[W]e were having some marital problems; and having been divorced once ... I didn't want a divorce.... I thought the least I could do to reassure Betty ... is to ... put our names on it jointly."

In 1985, the parties were showing the residence on their "balance sheets" at a value of $120,000. They embarked on a remodeling project which, according to Robert, cost $250,000. Despite that expenditure, the parties agreed at trial that the residence was worth only $175,000.

Robert owned two farms before the marriage: the "Webb Tract," shown in the decree as 80 acres, and the "Hershey Farm," shown in the decree as 240 acres. The trial court found that during the marriage, Robert

---

1. The case was tried July 11–12, 1991. The final decree was not filed until March 19, 1993. We noted, with chagrin, a similar delay in another dissolution case, *In re Marriage of Short,* 847 S.W.2d 158, 163 n. 3 (Mo.App.S.D.1993).

paid off a $41,852.56 loan on the Hershey Farm with marital funds.

During the marriage, the parties acquired other real estate: the "Cook Farm," shown in the decree as 200 acres; the "Scott/Snow Farm," shown in the decree as 320 acres; the "Keeling Farm," shown in the decree as 200 acres; the "Blake Property," shown in the decree as 116 acres; the "Spicer Tract," characterized in the decree as "City Lots"; and an undivided half interest in the "Burr Crossing Property," shown in the decree as 271 acres.

The parties used the farms for a "commercial cattle operation." At time of trial, the parties owned approximately 180 cows, 150 to 160 calves, and 7 bulls. The decree valued the herd at $133,200.

Robert's gross income from his medical practice for the three years immediately preceding trial was:

1988, $343,724
1989, $255,926
1990, undetermined, but in excess of $320,000

Robert testified that in July, 1990, he began having chest pain. Since then he had undergone three "balloon coronary artery angioplasties." He was scheduled for coronary artery surgery the week after trial. He estimated returning to work in four weeks if everything went well, but his convalescence could be longer if there were complications.

The trial court divided the marital real estate as shown below: *

The trial court set apart to Robert, as separate, nonmarital real estate, the Webb Tract and the Hershey Farm. The trial court found the Webb Tract was worth $56,000, and was subject to a $45,000 debt, for a net value of $11,000. The trial court valued the debt-free Hershey Farm at $120,000.

The trial court set apart to Robert, as separate, nonmarital property, a multitude of items of personal property. The trial court made no findings regarding the value of any of those items.

The trial court set apart to Betty, as separate, nonmarital property, a multitude of items of personal property. The trial court made no findings regarding the value of any of those items.

The trial court awarded Robert, as marital property, a multitude of items of personal property. The list of those items characterizes them as "unvalued marital property." As the designation suggests, the trial court made no findings regarding the value of any of those items.

The trial court awarded Betty, as marital property, a multitude of items of personal property. The list of those items characterizes them as "unvalued marital property." The trial court made no findings regarding the value of any of those items. The trial court did, however, find that the unvalued marital personal property awarded to Robert and Betty, respectively, was of "approximate equal value." Neither party challenges that finding.

The trial court awarded Robert, as marital property, a multitude of items of personal property to which the trial court assigned values. The aggregate of those values was $328,179. The cattle herd was included in that property, accounting for $133,200 of the value.

The trial court also awarded Robert, as marital property, his "pension plan," to which he contributes through the hospital. The trial court valued that asset at $171,321.

The trial court awarded Betty, as marital property, a multitude of items of personal

*

| Property | Value | Debt | Net | Party |
|---|---|---|---|---|
| Marital residence | $175,000 | $22,945 | $152,055 | Betty |
| Scott/Snow Farm | 160,000 | | 160,000 | Betty |
| Cook Farm | 100,000 | | 100,000 | Robert |
| Keeling Farm | 100,000 | | 100,000 | Robert |
| Blake Property | 52,200 | 32,000 | 20,200 | Robert |
| Spicer Tract | 40,000 | | 40,000 | Robert |
| Burr Crossing | 143,500 | | 143,500 | Robert |

property to which the trial court assigned values. The aggregate of those values was $37,074.

The trial court ordered Robert to pay the following debts and hold Betty harmless on them: $20,000 to Robert's father; $15,000 to Betty's mother; $125,000 to Bank of Neosho.

The trial court, for the purpose of making "a more equitable division of the marital property," ordered Robert to pay Betty $30,000 within 12 months.

The trial court awarded Betty maintenance of $2,500 per month, payable until her remarriage or death. The decree provides that the maintenance shall not be terminated by Robert's death, but shall become payable by his estate. The decree further provides:

"[Robert] is required to hold and maintain, through the payment of premiums sufficient, at a minimum, to maintain benefits accrued under such contracts at the time of trial, the eight life insurance policies awarded to him for the payment of maintenance to [Betty] after [Robert's] death."

Although the evidence regarding the insurance policies referred to in the decree is sketchy, the parties, in their respective briefs, agree that the aggregate "face value" of the policies is $375,000.

Betty does not complain about the maintenance order, and Robert did not perfect an appeal.[2] Therefore, the maintenance order is not in issue in this appeal, and we express no opinion about it.

Betty begins her argument by asserting that when the marital debts are deducted from the marital assets, a net marital estate of $1,092,329 remains. That figure, however,

comprises only the marital property to which the trial court assigned values. As reported earlier, each party was awarded a multitude of items of "unvalued marital property" of "approximate equal value." Regarding the marital property to which the trial court did assign values, Betty says the aggregate net value of such property awarded Robert is $713,200 (65.3 percent), whereas the aggregate net value of such property awarded her is $379,129 (34.7 percent).

Betty directs our attention to § 452.330, RSMo Supp.1988.[3] Regarding the first factor in that statute, Betty correctly points out that a gross disparity exists in the economic circumstances of the parties. Robert's prodigious earning capacity as a surgeon and cattleman is compellingly demonstrated by the record. Betty, while employable, is experienced in only clerical work for modest wages. The trial court, in awarding maintenance, found Betty was unable to support herself through appropriate employment. *See:* § 452.335.1(2), RSMo Supp.1988.

Citing *In re Marriage of Hash,* 838 S.W.2d 455, 460 (Mo.App.S.D.1992), Betty maintains that division of marital property should be utilized as a means of providing future support for an economically dependent spouse, and that a demonstrated disparity in economic circumstances requires an award of at least an equal, if not greater, share of the marital property to the wife.

In *Hash,* the trial court awarded 70 percent of the marital property to the husband and 30 percent to the wife. During the parties' 21–year marriage, the wife worked several years outside the home and also worked several years in businesses owned by

---

**2.** Robert filed a notice of appeal, but filed no brief as appellant in that appeal. Consequently, the appeal was dismissed.

**3.** Section 452.330, RSMo Supp.1988, reads, in pertinent part:

"1. In a proceeding for dissolution of the marriage ... the court shall set apart to each spouse his nonmarital property and shall divide the marital property in such proportions as the court deems just after considering all relevant factors including:

(1) The economic circumstances of each spouse at the time the division of property is to become effective ...;

(2) The contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker;

(3) The value of the nonmarital property set apart to each spouse;

(4) The conduct of the parties during the marriage; and

(5) Custodial arrangements for minor· children.

...."

Betty acknowledges that subparagraph "(5)" does not apply.

the couple. She was also the homemaker throughout the marriage. This Court noted the accumulation of the greater part of the marital assets resulted from work and contribution of both parties. *Id.* at 460. This Court amended the trial court's decree so as to award the wife a larger share, but less than half, of the marital property.

Here, the parties were married 13 years before separating—a shorter marriage than *Hash.* Betty, like the wife in *Hash,* was the homemaker. However, Betty's mother participated in the housework, along with hired housecleaners. Furthermore, unlike *Hash,* the accumulation of marital assets here resulted primarily from Robert's earnings as a surgeon and cattleman.

Additionally, Betty enjoyed a more genteel lifestyle than the wife in *Hash.* Robert's testimony included this:

"Q. ... What's their sleep schedule— the women in your house?

A. I came home at 11:30 the other morning and everybody was still in bed.... I'm usually up by 5:00; leave about 7:00.

. . . .

Q. Do they sleep in late—generally?

A. Yes."

Betty's economic circumstances, although vastly inferior to Robert's, are considerably enhanced by the $30,000 annual maintenance awarded her. Furthermore, in addition to the marital residence, she was awarded a 320–acre debt-free farm used in the cattle operation. Inferably, it has rental value. Inasmuch as the parties lived under the same roof during the 10–month interval between separation and trial, it is conceivable Robert would be willing to lease the farm from Betty for pasture.

As to the second statutory factor (§ 452.-330.1(2), footnote 3, *supra*), Betty underscores the evidence that her contribution as a homemaker included being a social hostess at dinners and parties for Robert's medical associates and friends "of the same socioeconomic level as ourselves." Betty also testified she kept the books for the cattle operation and performed chores on the farms, collecting hay, working cattle, and driving a pickup.

Those contributions cannot be ignored. However, Robert reminds us that the marital residence, awarded to Betty, was his before the marriage and was valued at $120,000 when it became marital property as a result of the 1983 deed. Furthermore, the evidence showed, and the trial court found, that before the marriage Robert owned stock valued at $39,000 in a nursing home. During the marriage, the stock was sold for $161,838, which was used to reduce indebtedness on marital farms.

Before the marriage, Robert also owned stock in a hospital, described in the testimony as "the old corporation before ... the new hospital [was built]." That stock was valued at $32,036 at the time of the marriage. It was sold during the marriage for $55,000, which was also used to reduce indebtedness on marital farms.

Thus, over $336,000 of the value of the marital estate can be directly traced to Robert's premarital assets. In that regard, Robert cites *Gremaud v. Gremaud,* 860 S.W.2d 354, 357 (Mo.App.E.D.1993), which holds that transmutation of separate property into marital property will not preclude the trial court from considering the premarital contribution of a spouse in dividing the marital property. There, the appellate court affirmed a 58/42 percent division of marital property in favor of the wife who brought into the marriage a greater amount of premarital property than did the husband.

*In re Marriage of Cornell,* 550 S.W.2d 823 (Mo.App.1977), cited by Betty, does not require an equal division of the marital property here. In *Cornell,* the parties married as young adults, had three children, and separated for the last time after 24 years of marriage. The wife worked the first two years of the marriage while the husband completed his college degree. All the marital property was accumulated during the marriage. Those facts are dramatically different from the circumstances here.

*Goller v. Goller,* 758 S.W.2d 505 (Mo.App. W.D.1988), also cited by Betty, is likewise inapposite. There, the parties married as

young adults, had six children, and separated after 32 years of marriage. The wife worked the first seven years of the marriage, including the years when the husband earned a law degree, enabling him to enjoy a lucrative career as a lawyer. All the marital property was accumulated during the marriage.

The other cases cited by Betty are also too different factually to be controlling here. We need not lengthen this opinion by discussing them.

Betty complains that she was awarded only one tract of income-producing marital real estate, the Scott/Snow farm, whereas Robert was awarded the remainder of the income-producing marital real estate. Betty cites two cases which recognize that the balance between income-producing and non-income-producing property is a factor to be considered in dividing marital property. However, in both cases, one spouse was awarded all of the income-producing property. That is not so here. Furthermore, as we understand Betty's brief, she does not want any additional real estate. Instead, she wants Robert's pension plan in its entirety.

Betty reminds us she was not guilty of any misconduct (§ 452.330.1(4), footnote 3, *supra*). However, neither was Robert. Additionally, the decree places an aggregate value of $44,942 on the life insurance policies Robert is required to maintain to ensure payment of maintenance to Betty if he predeceases her. That amount is included in the total value of marital personal property awarded Robert. Yet, as we understand the decree, Robert is barred from redeeming the policies for their cash surrender value, and must continue paying premiums on them.

■ The Supreme Court of Missouri has defined abuse of judicial discretion as an "untenable judicial act that defies reason and works an injustice." *Moore v. Board of Education of Fulton Public School No. 58*, 836 S.W.2d 943, 948[10] (Mo. banc 1992), *cert. denied*, ─── U.S. ───, 113 S.Ct. 1270, 122 L.Ed.2d 666 (1993). Said another way, judicial discretion is abused when a trial court's ruling is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Shirrell v. Missouri Edison Co.*, 535 S.W.2d 446, 448[2] (Mo. banc 1976). If reasonable persons can differ about the propriety of the trial court's action, it cannot be said that the trial court abused its discretion. *Id.*

■ A trial court's division of marital property does not have to be equal; it must be fair and equitable and take into account the factors enumerated in § 452.330.1. *Cofer v. Price–Cofer*, 825 S.W.2d 369, 374[4] (Mo. App.S.D.1992); *Mistler v. Mistler*, 816 S.W.2d 241, 252[8] (Mo.App.S.D.1991). Disparity in the value of marital property awarded each spouse is appropriate if the relevant factors, statutory or otherwise, justify an unequal division. *Cofer*, 825 S.W.2d at 374[5]; *Mistler*, 816 S.W.2d at 252[10]. Awarding one party a considerably higher percentage of the marital property than the other party is not *per se* an abuse of discretion. *Cofer*, 825 S.W.2d at 374[6]; *Hayes v. Hayes*, 792 S.W.2d 428, 431 (Mo.App.S.D. 1990).

The record here, viewed favorably to the trial court's decree, does not demonstrate that the division of marital property is clearly against the logic of the circumstances or is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. We are persuaded that reasonable persons can differ as to whether the trial court awarded Betty too small a share of the marital property. That being so, the trial court did not abuse its discretion.

The decree of dissolution of marriage is affirmed.

FLANIGAN, P.J., and GARRISON, J., concur.