Ellyn C. BOLD, Appellant–Respondent,

v.

Lawrence R. BOLD, Respondent–Appellant.

No. 77995.

Supreme Court of Missouri,
En Banc.

Dec. 19, 1995.

Rehearing Denied Jan. 23, 1996.

Lynn E. Fox, Allen S. Russell, Kansas City, for appellant-respondent.

Michael J. Albano, John W. Dennis, Jr., Independence, for respondent-appellant.

COVINGTON, Judge.

Ellyn Bold and Lawrence Bold both appeal various portions of a dissolution decree. The court of appeals affirmed in part and reversed in part. This Court granted transfer to consider only Mr. Bold's exception regarding medical expenses for the couple's child. Affirmed in part; reversed and remanded in part.

This factually complex dissolution is before this Court after extensive hearings, motions and rulings below. On January 26, 1989, Ms. Bold filed for dissolution. The trial judge referred the case to a special master who held sixteen days of hearings over the course of six months, the last of which was held on June 7, 1990. On July 3, 1991, the master adopted Ms. Bold's proposed report, along with her findings of fact and conclusions of law, as his own report and recommendation. Upon Mr. Bold's objection, the trial court issued its first decree in the matter, sustaining the objections in part. Ms. Bold's motion to amend, and a subsequent evidentiary hearing, delayed the trial court's final decree until November 23, 1993.

The final dissolution decree awarded to the parties joint custody of the couple's only child, Merritt. The court ordered that the child reside with Ms. Bold and that Mr. Bold pay $1,400 per month in child support. It further required that Mr. Bold pay Merritt's medical expenses. Additionally, Mr. Bold was required to pay Ms. Bold $3,000 in rehabilitative maintenance for a minimum of six months and until Mr. Bold's house was sold. The extensive decree designated the property at issue as marital or non-marital then allocated to the parties their respective interests. The decree also provided for the payment of various marital debts.

Among his assertions on appeal, Mr. Bold contends that the trial court erred in the manner in which it ordered him to pay not only Merritt's health insurance, but, also, all non-covered medical expenses. The trial court's medical expense provision reads as follows:

> Respondent shall maintain health, hospitalization and major medical insurance for [Merritt Bold] until the emancipation of the child or until further order of the Court. Respondent shall be responsible for and pay any and all applicable insurance premiums, together with the applicable deductible or co-payment. Respondent shall also pay 100% percent of the cost of any non-covered or excluded treatments, procedures or conditions.

Mr. Bold contends the requirement that he pay one hundred percent of the cost of any "non-covered or excluded treatments, procedures or conditions" is too vague to be enforceable and unreasonably excessive in light of his financial condition.

In *Lay v. Lay*, 912 S.W.2d 466 (Mo. banc 1995) and *Krane v. Krane*, 912 S.W.2d 473 (Mo. banc 1995), this Court considered similar language in court decrees that required that an obligor be responsible for certain medical expenses for the minor children. Unlike *Lay* and *Krane*, however, the language at issue in this case does not emanate originally from an agreement entered into by the parties and later incorporated into a trial court's order. The medical expense provisions quoted above are included in an amend-

ed decree of dissolution entered by the trial court, dated November 26, 1993. For this reason the present case is entirely distinguishable from *Lay* and *Krane*.

This Court is generally bound by the statutory pronouncements of the General Assembly regarding dissolution law. *Cates v. Cates*, 819 S.W.2d 731, 734 (Mo. banc 1991). Medical expense provisions are governed by section 454.603, RSMo 1994, which states in pertinent part:

2. With or without the agreement of the parents, the court or the division may require that a child be covered under a health benefit plan. Such a requirement shall be imposed whenever a health benefit plan is available at reasonable cost through a parent's employer or union. If such a plan is not available at reasonable cost through an employer or union, the court or the division, in determining whether to require a parent to provide such coverage shall consider:

(1) The best interests of the child;

(2) The child's present and anticipated needs for medical care;

(3) The financial ability of the parents to afford the cost of a health benefit plan; and

(4) The extent to which the cost of the health benefit plan is subsidized or reduced by participation on a group basis or otherwise.

. . . .

5. The court shall require the obligor to be liable for all or a portion of the medical or dental expenses of the minor child that are not covered by the required health benefit plan coverage if:

(1) The court finds that the health benefit plan coverage required to be obtained by the obligor or available to the obligee does not pay all the reasonable and necessary medical or dental expenses of the minor child;

(2) The court finds that the obligor has the financial resources to contribute to the payment of these medical or dental expenses; and

(3) The court finds the obligee has substantially complied with the terms of the health benefit coverage.

At issue is the validity of the trial court's order requiring that Mr. Bold be financially responsible for one hundred percent of all "treatments, procedures or conditions" not covered by or excluded from his insurance policy. Specifically, Mr. Bold disputes the trial court's ruling as it applies to treatment for Merritt for a pre-existing condition that was excluded from coverage under Mr. Bold's current medical insurance policy.

Prior to making any award to Mr. Bold for non-covered medical expenses, the trial court was required to take into account the requirements of section 454.603.5. This Court cannot ascertain from the record whether the trial court followed the requirements contained in section 454.603.5. The cause, therefore, is remanded for clarification on this issue.

As stated above, both appeals contain numerous other issues. Being in agreement with the court of appeals' disposition of the remaining issues, this Court sets forth verbatim and adopts the relevant portions of the unpublished opinion of the court of appeals authored by the Honorable Don W. Kennedy:

## HOMEOWNER'S INSURANCE PROCEEDS

The parties in November of 1991 received $27,170.26 from insurance for a burglary loss. Wife received this check. She testified she had used the proceeds to replace assets that had been stolen, and had used the balance on living expenses, all before November 10, 1993 (date of last evidentiary hearing before the trial court).

The trial court decree awarded wife half the insurance proceeds ($13,585.13) as marital property, and made no award of the balance.

Husband complains in his appeal that his half of the insurance proceeds ($13,585.13) was erroneously omitted from the decree, and should have been awarded to him. There was no error in this omission.

The court apparently believed that none of the insurance proceeds were left, and

the court did not consider wife's use of the proceeds to have been improvident, so as to justify charging wife with this $13,585.13, under the rule of *Sinclair v. Sinclair*, 837 S.W.2d 355 (Mo.App.1992).

Wife does not seek affirmative relief against the inclusion of $13,027 in her award of marital property, but only resists husband's complaint of the omission of $13,027 from his marital property award.

## OMISSION OF CREDIT CARD AWARD

Husband complains that the court did not award him $6,044.79 which the wife had charged to husband's credit card accounts. These were charges incurred by wife during the pendency of these proceedings, and during a time husband, so husband says, was paying wife temporary support.

Wife testified, on the other hand, that the charges were incurred during a time when she was receiving no maintenance or child support. The trial court could believe this testimony. The decree recited that the charges were incurred from January 1 and June 30, 1989, and recited, furthermore, that these charges had been taken into account in allocating marital property and debts.

The trial court was not in error in failing to award husband reimbursement of credit card charges in the sum of $6,044.79.

## BLOUSTEIN CONTRACT RECEIVABLE

The court awarded to husband, as marital property, a contract receivable at a value of $65,840. Husband says this should not be included in marital property, since it had been paid off before the time of the November 26, 1993, decree, and was no longer in existence.

The contract was an installment contract, originally $100,000, bearing no interest. At the time of the commissioner's July 3, 1991 order, its balance was $91,840. Husband's December 31, 1991, and his February 11, 1992, statements show the value of the contract as $65,840, the amount at which the trial court valued the contract in the judgment. By October 22, 1993, husband lists the balance on the Bloustein contract as zero. On September 2, 1993, the initial judgment in the case lists the contract at $65,840, and the final judgment gives the Bloustein contract that value.

We note that the contract was wholly paid during the pendency of these proceedings. If husband had put the proceeds into marital property, he would have a good argument that the designation of the paid-off contract as marital property would have been duplicative. However, husband made no attempt to show that its proceeds went into other marital property, and we cannot assume that it did go into marital property. It could as well have swelled his non-marital estate.

We find no error in listing the Bloustein contract receivable as marital property, even though it had been paid and was no longer in existence. *S.L.J. v. R.J.*, 778 S.W.2d 239 (Mo.App.1989).

## PRIBOTH CLAIM

There was a marital asset which consisted of a claim against one Priboth. Husband collected $142,000 on this claim. He had $80,000 of the proceeds left at the time of the last evidentiary hearing November 10, 1993. The court awarded wife $50,000 of this amount. Husband says this was error. There was no error in this award.

## ATTORNEY'S FEES

The court awarded wife attorney's fees of $39,250. Husband claims this was error. He does not say the fees were unreasonable, but says that the wife had sufficient moneys to pay her attorney's fees, and that the court abused its discretion in making the attorney's fee award to wife.

We have reviewed the record closely and find no error in this award of attorney's fees. The wife's earning capacity is far less than husband's and husband's non-marital estate is a great deal more than wife's. The court in awarding attorney's fees is to consider all relevant factors.

*Walker v. Walker,* 631 S.W.2d 68 (Mo.App. 1982). In reviewing the entire record, we conclude that the trial court was within the wide latitude allowed trial courts in awarding attorney's fees. See *Cummings v. Cummings,* 645 S.W.2d 146, 148 (Mo.App. 1982).

## CHILD SUPPORT

Husband complains of the award of $1,400 per month child support for Merritt Bold, and the decretal provision for him to pay child's medical expenses. Husband argues that Merritt should be sent to public schools instead of private school (Pembroke Hill) at a cost of $725 per month. He says wife's "stated needs" of $150 per month for clothing, and $40 per month for haircuts, are "symptomatic" of her unreasonableness. The evidence shows the child to be somewhat fragile, and in need of special services. The evidence of the youngster's problems and needs is detailed in the evidence. The trial court's award is reasonable in the light of those needs.

Husband thinks the court did not give sufficient consideration to his financial resources, which he says cannot support the trial court award. It is not easy to tell from the evidence what husband's income is. Funds come into his personal bank accounts from cryptic sources, which husband says are not income.

Husband gives an account of his income which shows monthly income of $10,611. Among husband's monthly expenses, he lists (besides personal expenses of $3,347) debt payments of $13,326 per month. The inclusion of these debt payments, and the inclusion of $3,100 per month child support and maintenance, result in a monthly shortfall of $5,815. These debt payments appear to be business-related debts, secured—in some cases, at least—by business properties. These business properties evidently do not throw off enough income to service the debts, so husband is required to invade income from other sources to service them. It is quite possible that the assets acquired through the proceeds of these debts, while not producing current income, are yet increasing in value with each debt payment. It could be, also, that husband could eliminate the debts by the sale of assets. Without a more thorough examination of the debts than this record affords, we cannot say the husband's income (available for payment of child support) is to be reduced by business indebtedness payments.

Excluding the debt payments, it appears that husband has $7,264 available for the payment of maintenance and child support.

We hold, then, that the court's child support award is supported by the evidence, and is affirmed.

## REHABILITATIVE MAINTENANCE

Husband has several complaints about the non-modifiable rehabilitative maintenance ordered to be paid to wife at the rate of $3,000 per month. This was payable, under the court's decree, for as long as wife should live in the family residence (owned by husband as non-marital property), but at least for six months. The rehabilitative maintenance would be terminated upon the sale of the house—which was husband's to sell—or after the lapse of six months, whichever was later.

Husband says wife can take care of herself. Once she had a job which paid $43,000 per annum, but that was terminated in 1988. She recently had been working for her attorney as a legal assistant. She testified she earns about $2,000 per month.

The court was within its discretionary latitude to award rehabilitative maintenance of $3,000 per month for a limited period. We note wife makes no complaint about the time limitation on the maintenance.

Husband points out he is required to make mortgage payments and maintenance payments on the house until it is sold. He adds up the mortgage payments, and they are indeed substantial and, very likely, burdensome to husband. They are temporary, and will come to an end as soon as husband sells the house. The principal payments on the mortgages, of course, go to increase husband's equity in the house.

The rehabilitative maintenance award is affirmed.

## II. WIFE'S APPEAL

Wife does not complain about the maintenance or child support awards. Her complaints are directed at the court's division of marital property; to its characterization of certain marital property as non-marital, and vice-versa; and to its recognition of certain contingent liabilities of husband as real liabilities.

Wife received designated marital property valued by the court at a total of $194,246.13, plus a $150,000 compensatory cash award payable by husband to wife. Of this total, wife claims that two items should have been awarded to her as non-marital property, and should not have been designated as marital property. Those two items were: five bonds of American Cities Business Journal, valued in the decree at $12,000; and a Smith Barney Vantage account, valued in the decree at $15,-000.

Husband received 56 items of designated marital property, totalling $1,538,264, and was ordered to pay wife a compensatory case award of $150,000. Of these items, wife says an item of 8,000 common shares of Plaza Manor, Inc., valued by the court at a negative $57,740, was undervalued.

Husband received non-marital property of the total value of $1,724,012. Included in that total were: a 99 percent general partnership interest in Overland Park Village Apartments, valued by the decree at $1,126,559 (claimed by wife to be partially marital property); a 40 percent general partnership interest in Plaza Manor Associates, valued by the decree at $530,868 (claimed by wife to be marital property); and a three percent general partnership interest in Broadway Plaza Medical Building, valued by the decree at $12,100 (claimed by wife to be partly marital property, and to be undervalued).

Husband was ordered to pay marital debts totalling $9,412,036.

We take up wife's contentions in order:

## AMERICAN CITIES BUSINESS JOURNAL SECURITIES

Wife says the court erred in designating American Cities Business Journal Bonds (or perhaps preferred stock; the testimony refers both to preferred stock and to bonds, which seem to represent the same security) as marital property. The securities were valued by the court at $12,000 and were awarded to wife.

The wife's testimony (January 25, 1990) was that the purchase of these securities in 1987 was from moneys received by her from her parents as a gift, and also from her earnings. She did not say how much came from the marital source (her earnings), and how much from the non-marital source (gift from parents). Wife listed them as marital property in her November 10, 1993, statement of marital and non-marital assets. We are unable to say the trial court was in error in designating these securities as marital property.

## SMITH BARNEY VANTAGE ACCOUNT

Wife says the trial court erred in designating her Smith–Barney Vantage Account as marital property. The trial court valued this account at $15,000, and awarded it to wife.

On her November 10, 1993, statement of marital and non-marital assets, wife listed this account as a marital asset. The value listed, however, was $1,574, not $15,000. Her testimony was that the listing of this account as marital property was in error, and that the account was actually funded by gifts from her parents. We defer to the trial court in its designation of the property as marital property, but the assigned value was clearly wrong. It should be valued at $1,574.

## VALUATION OF PLAZA MANOR, INC.

The court assigned to husband's 40 percent interest in Plaza Manor, Inc., represented by 8,000 shares in the corporation, a negative value of $57,740. This was marital property, and it was awarded to hus-

band. Husband concedes there is no evidence at all to support this valuation. Husband's October 22, 1993, financial statement lists the value of the corporate assets at a positive $57,740. The trial court's negative $57,740 valuation was presumably a typographical error. Husband's supporting memorandum shows the "book value" of Plaza Manor, Inc. (as of December 31, 1992) as $448,109. To arrive at "Value of Plaza Manor, Inc.," the memorandum *deducts* "Book value of fixed assets" in the sum of $151,085, and also *deducts* $152,673 for an item called "Due *from* (emphasis ours) Plaza Manor Associates." The resulting "value of Plaza Manor, Inc." is $144,351. Husband's 40 percent interest is therefore $57,740.

On the other hand, the Plaza Manor, Inc. 1991 income tax return shows total equity of $516,034 as of year's end. (This balance sheet includes as an *asset* $119,628 "due from Affiliate." We can only suppose that this may be the same as the $152,673 "Due from Plaza Manor Associates" which is listed as a *liability* of the corporation in husband's memorandum, referred to above.) Husband's 40 percent share of the total equity of $516,034 would be $206,414. The franchise tax return for 1991, showing December 31, 1991, figures, was in substantial agreement with the income tax return. Husband's "Statement of Marital and Non–Marital Property and Liabilities," filed with the court, bearing date of February 11, 1992, shows the Plaza Manor, Inc. shares at a negative value of $19,329.

Neither party presented evidence of actual value of the shares, or of the underlying assets. The only evidence was that we have recited. Book value—at least after the corporation has aged—bears only a remote relationship to actual value. This much is clear: The evidence before the court showed husband's 40 percent share in Plaza Manor, Inc., was worth more than a negative $57,740, and worth more than a positive $57,740. In this valuation the trial court was in error. There is a great deal of useful information missing here. But we take the record as we find it; we do not take the initiative to fill in the yawning lacunae in the record. The income tax information, which the taxpayer has no incentive to inflate, seems to us to be the most reliable information before the court. That return shows net book value of $516,034. The return shows for the year 1991 "net income per books" of $274,336. (The tax return balance sheet shows retained earnings of $496,034.)

A 40 percent share of the book value of the assets of Plaza Manor, Inc., underlying the husband's stock, would be $206,414. A minority interest in the corporation is not necessarily worth less than the liquidating value; it depends upon a number of factors on which the record is silent.

This asset is valued at $206,414, which has the effect of increasing marital property by $264,154 ($206,414 plus $57,740.)

## OVERLAND PARK VILLAGE APARTMENTS

Wife says the court erred in designating as husband's non-marital property three pieces of real estate—a 99 percent interest in an Overland Park apartment complex, referred to as the "RIG" Apartments; a 40 percent partnership interest in another apartment complex, Plaza Manor Associates; and a three percent interest in Broadway Plaza Medical Building.

Husband owned the RIG Apartments before their marriage. In the antenuptial agreement, wife expressly waived any interest therein. During the marriage, husband sold the property and, as part of the purchase price, took back a second mortgage in the sum of $2,454,768.16. (He received $900,000 in cash, which will come into the case later.) The buyers defaulted, and husband, in lieu of foreclosure, took back the property. As a part of his agreement with the defaulting purchasers, he released them from liability on their second mortgage note. The forgiveness of these amounts was a condition imposed by Housing and Urban Development upon its guaranteeing $3,710,000 of new financing from Bankers Mortgage. The forgiven amount included unpaid principal of $2,454,768.16 and $653,478.58 accrued interest. Wife says this $653,478.58 in inter-

est accrued during their marriage, and was therefore marital property. Husband in effect, according to wife's argument, used $653,478.58 of marital funds (in the form of accrued interest) to repurchase the RIG (by this time named the Overland Park Apartments). The balance of the repurchase price, $2,454,768.16, was the unpaid principal of the forgiven note.

Wife is correct on this point. Earnings from non-marital assets during the marriage are marital property. *In re Marriage of Gardner*, 890 S.W.2d 303, 305 (Mo.App.1994); *Bizzell v. Bizzell*, 697 S.W.2d 559, 563 (Mo.App.1985).[1] Marital property therefore contributed 21.02 percent of the repurchase price of the Overland Park Apartments. That percentage of the Overland Park Apartments was marital property. The court placed a value of $1,126,559 on this property. This figure was evidently net of encumbrances. The sum of $236,802.70 ($1,126,559 × .2102) is added to the marital property total.

## PLAZA MANOR ASSOCIATES

Plaza Manor Associates was a partnership, in which husband had a 40 percent general partner's interest. His partner was a Dr. Tutera, who had a 60 percent interest.

Husband's interest was valued by the court at $530,868, and it was awarded to him as non-marital property.

Wife challenges the designation of this as non-marital property. Husband says the Plaza Manor Associates is the same entity as Columbia Building Company, in which he had a 50 percent interest at the time of the marriage. He says wife, by the antenuptial agreement, waived any interest in his Columbia Building Company partnership.

Wife says that Plaza Manor Associates is a different entity from Columbia Building Company, but husband says they are the same. The federal tax identification num-

bers of the two entities are the same. We hold the trial court's finding they were the same entity was supported by the evidence.

Wife says husband contributed $793,806 to Plaza Manor Associates during the marriage, which amount should be designated marital property. Husband says, on the other hand, that his Plaza Manor contributions came from the proceeds of the sale of the non-marital RIG Apartment complex in Overland Park. Husband received $900,000 cash from the sale of the apartment complex in September, 1982.

The tracing of the RIG Apartment proceeds into Plaza Manor Associates rests wholly upon the husband's naked conclusory oral testimony. There appears in a joint account with George K. Baum & Co. on September 8, 1982, in the joint names of husband and wife, an initial deposit of $700,000. (Wife does not contend the $700,000 was thus converted into marital property. The identifying number on the account was wife's social security number.) There is some evidence this $700,000 came from the RIG Apartment proceeds. In all the documentation, there is no evidence this $700,000, or any part of it, went into Plaza Manor Associates. Husband's accountant testified to an effort on his part to trace the RIG Apartment proceeds. He said he had traced them to a George K. Baum money market account. "Q. And where from there? A: Nothing beyond that. Q. You don't know where it went from there? A. No. I don't recall."

The George K. Baum account shows withdrawals during 1982 and 1983. At the beginning of 1983, there was only $141,238.82 left in the Baum account. By October 25, 1983, the account had been reduced below $3,000. During 1983, husband made, according to the partnership tax return, total capital contributions of $235,000 to Plaza Manor Associates. All the remainder of the $793,806 in capital contributions made by husband during the mar-

**1.** Wife by her antenuptial agreement waived any interest in the RIG apartment complex, as well as "all property hereafter acquired ... from proceeds of the disposition of assets now owned...." That language does not include earnings from the apartments, or earnings from the proceeds from their sale.

riage were made in the years 1984 through 1988.

Against the foregoing stands husband's unsubstantiated and unamplified conclusory testimony that $665,000 contributed to Plaza Manor Associates came from the RIG Apartment sale proceeds.[2] In this case, this is not sufficient to overcome the presumption that property acquired after marriage is marital property. Section 452.330.3, RSMo 1994. It was husband's burden to trace the non-marital property into his capital contributions to Plaza Manor Associates. The tracing was inadequate. Compare tracing evidence in *Sprock v. Sprock,* 882 S.W.2d 183, 186 (Mo.App.1994); *In re Marriage of Betz,* 880 S.W.2d 618, 622 (Mo.App.1994); *Winter v. Winter,* 712 S.W.2d 423, 428 (Mo. App.1986). We hold the trial court's finding that Plaza Manor Associates was wholly non-marital property of the husband was against the overwhelming weight of the evidence, and that the trial court made a mistake in so finding.

The original value of Columbia Building Co. ($50,000) was non-marital property of the husband. The interest represented by his post-marital contributions to capital ($793,806) was marital property. Marital contributions represent 94 percent of Plaza Manor Associates' value of $530,868. This adds $499,015.92 to the marital property total.

## BROADWAY MEDICAL BUILDING

At the time of the marriage, husband owned a ten percent interest in the Broadway Plaza Medical Building. The antenuptial agreement valued this interest at $20,-000.

During the course of the marriage, husband purchased an additional 15 percent interest by the use of $54,150 in marital funds, thus increasing his interest to 25 percent.

During the dissolution proceeding, husband sold to his father most of his interest in the building, retaining three percent. A contract in evidence shows husband received from his father the sum of $109,-377.25, paid by cash $23,193.25, and the assumption by husband's father of husband's note payable to College Boulevard National Bank, with a balance of $86,184.

Husband did not account for the $23,-193.25 cash he received for the sale to his father of the 22 percent interest. The trial court designated the Broadway Plaza Medical Building three percent interest as husband's non-marital property and valued it at $14,773.00. To this should be added the $23,193.25 cash received by the husband and not accounted for. Of that total, *i.e.,* $37,966.25, three-fifths is marital property. The three-fifths represents the ratio of the non-marital 10 percent interest to the marital 15 percent interest. The value of the marital portion is $22,779.75.

With other marital property, which is not disputed as to its marital or non-marital character, nor as to its value, the total gross valuation of marital property totals $2,876,836.50.

## III. MARITAL DEBTS

Husband was ordered to pay marital debts totalling $9,412,036. Wife claims two items of marital debt should not have been deducted from the marital estate. One of these was an item called "deferred taxes," in the amount of $946,417. The other consisted of four contingent liabilities, in the amount of $6,927,692.

We take up these items of so-called marital debt:

## DEFERRED TAXES

The court erroneously included among husband's debts and obligations "deferred taxes" in the sum of $946,417. This was capital gains taxes which defendant would be required to pay if he sold all his property in a single year, offsetting gains and losses, and if the net capital gain should be taxed at a 33 percent rate. Husband testified, and now argues, that, owing to the

---

**2.** "Q. And where did that $665,000 come from?
  A. It came from the cash proceeds I got when I sold the Rig Apartments.

Q. Again, that's the apartments that you owned prior to the marriage?
  A. That's correct."

spread between his current income and his current obligations, he would inevitably have to sell his property. Such sales would trigger large income tax obligations.

This is too speculative to consider. It was not clear that sales could not be avoided. Husband would not in any event liquidate all his property recklessly, without any tax-saving strategy. Sales of several of the properties would result in capital losses, rather than capital gains. *In re Marriage of Gardner,* 890 S.W.2d 303, 306 (Mo.App.1994).

The sum of $946,417, representing "deferred taxes" is deducted from the total of husband's liabilities.

### CONTINGENT LIABILITIES

The trial court erroneously included among husband's debts contingent liabilities of $6,927,692. These were promissory notes which the husband had signed as surety. There is nothing in the evidence which gives any clue to the likelihood husband will ever be called upon to respond to these guaranties. One of the notes ($5,076,529) was secured by the pledge of stock of Citizens Bank and Trust of Shawnee, Kansas. Another ($1,658,000) was secured by the pledge of stock of Citizens State Bank of Kansas City, Kansas. On an October 7, 1993 financial statement (submitted as an answer to an interrogatory), husband had declared that the security for each loan was worth in excess of the debt. With respect to the other contingent liabilities, a Citizens' Bank loan as guarantor for DAB, Ltd. ($68,163) and a Midland Bank loan as guarantor for John Baggy, Inc. ($125,000), there is no evidence at all about the likelihood of husband's ever being called upon to pay any part of them. What evidence there is, is only that the principal debtors are paying the debts.

While husband makes a pro forma argument in defense of the deferred tax liability discussed in the preceding section of the opinion, he attempts no defense of these contingent liabilities as a dollar-for-dollar reduction of husband's net worth.

We deduct $6,927,692 from the total of husband's liabilities.

The marital debt, after deducting "deferred taxes" of $946,417, and contingent liabilities of $6,927,692, totals $1,537,927.

### IV. JUDGMENT

The marital estate, net of debts ordered to be paid by husband, is thus $1,338,909.50. Of that amount, the judgment, revised in accordance with this opinion, awards to husband, property valued at $1,158,089.37 and awards to wife marital property valued at $180,820.13.

The trial court made a compensatory cash award of $150,000, after finding that the net marital estate was less than zero. We have found, however, as above stated, that the net marital estate is $1,338,909.50. We conclude, for reasons set forth in the next paragraph, that the compensatory cash award, for which wife should have judgment against husband, should be $350,000, to bear interest from and after November 23, 1993, at the rate of nine percent per annum.

After payment by husband to wife of $350,000, husband's share of the marital property, net of the debt which he is required to pay, will be $988,909.50. Wife's share will be $530,820.13. This disparity is justified by the factors mentioned in section 452.330, RSMo 1994. Husband has made the greater contribution to the accumulation of the marital property. Furthermore, he takes highly leveraged property with the risk of loss, although with the hope and expectation of gain; it is not the equivalent of cash in the bank. It would not be feasible to award wife part of the real estate, for it is situated so that it requires expert management either to retain it or to liquidate it advantageously. The husband has that expertise, and wife does not.

The cause is affirmed in part and reversed and remanded in part with directions to the trial court to enter a new judgment in accordance with the foregoing opinion.

HOLSTEIN, C.J., BENTON, PRICE, LIMBAUGH and ROBERTSON, JJ., and GUM, Senior Judge, concur.

WHITE, J., not participating because not a member of the Court when case was submitted.